## Case No. 16,696.

UNITED STATES v. WILKINSON et al.

[See 12 How. (53 U. S.) 246.]

## Case No. 16,697.

### UNITED STATES v. WILL.

[20 Leg. Int. 341; [1] 11 Pittsb. Leg. J. 73; 5 Phila. 293; 2 Pittsb. Rep. 467.]

District Court, W. D. Pennsylvania. Sept. 21, 1863.

CONSCRIPTION LAWS—HINDERING ENROLLING OFFICER.

The act of congress of March 3, 1863 [12 Stat. 731], provides no punishment for obstructing, hindering, and delaying an enrolling officer, and an indictment will not lie therefor.

[This was an indictment against Joseph Will for violating the conscription act. Motion in arrest of judgment.]

Mr. Carnahan, U. S. Dist. Atty.

Mr. Noon, Mr. Mageehan, and Mr. Johnston, for defence.

McCANDLESS, District Judge. This case was argued at Pittsburgh, with marked ability, and this opinion written there, but as it involved a principle of national importance, I have delayed the announcement of my decision, until I could have a conference here with my brother, Mr. Justice GRIER. I am

[1] [Reprinted from 20 Leg. Int. 341. by permission.]

pleased to say that we concur in opinion. The defendant was convicted at the late term of this court upon an indictment charging him with "obstructing, hindering and delaying" an enrolling officer in the performance of his duties. The indictment is framed under the 25th section of the act of the 3d of March last, commonly called the "Conscription Act" [12 Stat. 735]. It is moved in arrest of judgment:

(1) That the act of congress, under which the indictment is drawn, does not provide any punishment for the offence for which the defendant is indicted. An act of congress passed during the commotion of a civil war, is, some times, difficult of construction. Its peace and warlike provisions must be separated, and the penal sanctions applicable to the one, should not be applied to the other. I have been impressed with this distinction in examining the provisions of the act in question. Its title indicates that it has two objects—first, "enrolling," and, second, "calling out" or drafting the "national forces." The first is a peaceful measure, the other is an order peremptory in its character and requiring force to support it. Since the world began, all civilized nations at given periods in their history have ascertained not only their material wealth, but their physical force. In ancient times it was an authentic declaration, before the censors, by the citizens, of their names and places of abode. In the United States, this enumeration has been once in ten years, and its primary object is to fix the rate of representation in congress, but to this is now added a vast compendium of the national resources. When a great public emergency arises, congress may direct another, and an intermediate enumeration for the purpose of ascertaining the power they possess to suppress insurrection or repel invasion, and this they have done in the present instance, the census of 1860 affording but an imperfect guide to the national strength in 1863. Congress had a right to suppose, and did suppose, that the enrollment would be a peaceful measure in which there would be a general acquiescence, and which required neither penalties nor military authority to accomplish it. The national force was to be found by the same mild means that an assessor would fix the value of real estate, or other property subject to taxation. From the past history of the American people, congress did not presume that there would be any resistance to a measure merely preliminary in its character. The act is not for the time being only, for this register of the people is to occur every two years, and without limitation. Congress designed that the government should at all times be ready, whether for a foreign war, or any new complication of domestic difficulties. Wise statesmen always anticipate such emergencies and provide for them. They have done so here, in trying to reduce to precision the force or power upon which they could rely to restore the rightful

authority of the government. The first eleven sections of this act are wholly taken up with provisions relative to the enrollment, and there is no penalty interposed for resisting the enrolling officer or omitting to respond to his inquiries, if he should choose to make them. Thus far the act treats the enrollment as a thing complete in itself. A draft may or may not be made. That is to happen when, in the judgment of the president, the public safety may require it. By the twelfth section, he is then authorized to assign "to each district," the number of men to be furnished by each district and "thereupon" the enrolling board shall, under the direction of the president "make a draft." This is the first exhibition of the warlike power. Then spring into activity the provost marshals, other officers and their subordinates, who are to draw or "call out" the people, in given classes, who have been previously enrolled. They are to answer the president's demand, or upon failure, they become, for the first time, subject to the rules and articles of war, except where the act directs that they shall be turned over to the civil authorities for trial. As was well said, upon the argument, the enrollment left every man where he was minding his own business; the draft took the citizen from his home, his parents, his wife, or his children.—Hence, congress might well consider the enrollment able to take care of itself; while the draft should be guarded by severe penalties. Full directions are given in the following sections, as to the mode of conducting the draft, until we arrive at the 24th and 25th, which may be termed the "penal clauses" of the bill. As this indictment derives its validity from the latter, this brings us to the consideration of the other reasons assigned for arresting this judgment, which is,

(2) That the indictment sets forth no crime for which the defendant can be convicted. The point is well taken. The section declares: "That if any person shall resist any draft of men enrolled under this act into the service of the United States, or shall counsel or aid any person to resist any such draft; or shall assault or obstruct any officer in making such draft, or in the performance of any service in relation thereto; or shall counsel any person to assault or obstruct any such officer, or shall counsel any drafted man not to appear at the place of rendezvous, or willfully dissuade them from the performance of military duty as required by law, such person shall be subject to summary arrest by the provost marshal, and shall be forthwith delivered to the civil authorities, and upon conviction thereof, be punished by fine not exceeding five hundred dollars, or by imprisonment not exceeding two years, or by both of said punishments." It will be borne in mind that the indictment charges that the defendant did "assault" the "enrolling officer," and did "hinder, delay and obstruct" him, in the performance of his official duties. But the

section has no reference to the enrollment except in the past tense, as a fact accomplished, an act consummated. The draft is the subject matter treated of, and the draft alone. It is the draft of men already "enrolled" under the provisions of the act. The clause "or in the performance of any service in relation thereto" can have for its antecedent the draft and nothing else. The sentence can bear no other grammatical construction, and that is its fair legal interpretation.

Congress having provided no penalty for obstructing the enrollment, we must take the law as we find it, and not create an offence by intendment. If experience has shown that the officers charged with this public function are not sufficiently protected, the omission can be supplied at the next session, and before, by the terms of the act, the next biennial enrollment is to take place. As the law now stands, the opinion of the court is with the defendant on both the points submitted, and the judgment is arrested.